IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SHERRY L. SULLEY, | ) | CASE NO. 8:08CV297 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, as | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial of two applications the Plaintiff, Sherry L. Sulley ("Sulley"), made under the Social Security Act. The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Transcript ("Tr.") at 70-72). The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. at 418-422). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration ("Administration") under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

## PROCEDURAL BACKGROUND

The Administration initially denied Sulley's application on July 26, 2004 (Tr. at 55-58), and again after reconsideration on October 7, 2004. (Tr. at 61-65). Sulley requested a hearing before an administrative law judge ("ALJ"), but she waived her right to counsel. (Tr. at 109). On June 5, 2006 a hearing was scheduled to take place before the Honorable Emily Cameron Shattil. (Tr. at 452). The hearing was continued, however,

because Sulley decided she wanted to retain counsel. (Tr. at 455). The hearing was rescheduled for August 4, 2006 (Tr. at 456), and, at that time, Sulley testified that it was her intention to proceed without representation. (Tr. at 458). The ALJ continued the hearing again in order to obtain results from a pulmonary function study and stress test. (Tr. at 468). On April 17, 2007, the ALJ continued the hearing once more because she had not yet had the opportunity to review the pulmonary function study and stress test. (Tr. at 482-483). A full hearing was held on August 9, 2007. (Tr. at 485).

On August 13, 2007, the ALJ rendered a decision in which she found that Sulley was not under a "disability" as defined by the Social Security Act at any time on or before the date of the decision (Tr. at 17-28). On May 29, 2008, after considering additional evidence (Tr. at 434-51), the Appeals Council of the Social Security Administration denied Sulley's request for review of the ALJ's decision (Tr. at 7-11). Thus, the ALJ's decision stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

In her applications for disability insurance benefits and supplemental security income, Sulley asserts a disability onset date of March 3, 2004, and that she is unable to work due a cardiac event (infarction). (Tr. at 21, 110).

**DOCUMENTARY EVIDENCE BEFORE THE ALJ**

Sulley was born on February 28, 1958, and was forty nine years of age at the time of the ALJ's decision (Tr. at 21). She had a twelfth grade education and her past relevant work consisted of employment as a cashier and a quality control inspector – work that is categorized as unskilled and semi-skilled, ranging from light to medium (strength per DOT). (Tr. at 161). Sulley reported that during her alleged period of disability, she had chest

discomfort several times a day, needed to rest every 10-15 minutes, was tired all the time, used an inhaler four times a day, and could carry no more than 20 pounds (Tr. at 140-145). She also complained of daily headaches (Tr. at 248 & 308), severe fatigue (Tr. at 275) and debilitating chest pain with cold sweats, headaches, shortness of breath and numbness in her left arm. (Tr. at 334-5). She claimed her daily activities were very limited. Sulley reported that she performed her household chores (dishes, cleaning and fixing meals) in short intervals (10-15 minutes) followed by rest (Tr. at 125). She went to the bank and to the grocery store once a week, but never by herself. (Tr. at 130). Sulley claimed that she could not climb all 19 steps up to her apartment without stopping for rest (Tr. at 130). Sulley had history of smoking 90 packs per year, and despite the advice of numerous different physicians, continued to smoke cigarettes. (Tr. at 179, 209, 232, 235, 246, & 299).

On March 3, 2004, Sulley experienced a post inferior wall myocardial infarction. (Tr. at 189). She received a stent in her right coronary artery ("RCA"). (Tr. at 184-202 & 209). During the procedure, she experienced ventricular fibrillation and required four shocks and CPR. (Tr. at 237). She had a good response to timely intervention and her left ejection fraction ("EF") remained at 60% to 65%. (Tr. at 237). Following her surgery, Sulley continued to have daily angina, and on July 28, 2004, she reported she had to take nitroglycerin tablets almost daily. (Tr. at 237).

On July 1, 2004, Bernie Hillyer, M.D., noted that Sulley's coronary artery disease ("CAD") seemed to be well-controlled. (Tr. at 205). Dr. Hillyer reported that Sulley claimed she experienced angina a couple of times a day, which apparently was a marked improvement over her previous status. (Tr. at 203). Sulley also complained of hip pain. (Tr. at 203). Dr. Hillyer noted that Sulley had a full range of motion in all her joints, and she was

not able to demonstrate a problem with her left hip. (Tr. at 205). After an examination, Dr. Hillyer reasoned that Sulley could certainly perform sedentary work and was not disabled. (Tr. at 205). Dr. Hillyer concluded that Sulley should avoid work that involved manual labor or a lot of physical activity. (Tr. at 205).

On July 19, 2004, P.L. Grossman, M.D., reviewed the record and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. at 172-80). Dr. Grossman concluded that Sulley could lift/carry up to ten pounds frequently and occasionally, stand and/or walk at least two hours out of an eight-hour workday, and sit for at least six hours out of an eight-hour workday. (Tr. at 173). Her ability to push/pull was unlimited, other than for lifting/carrying limitations. (Tr. at 173). According to Dr. Grossman's assessment, Sulley could occasionally perform all postural movements (Tr. at 174), and she had no manipulative, visual, communicative, or environmental limitations. (Tr. at 175-76). Dr. Grossman provided a narrative report indicating that Sulley would be able to perform the work indicated within twelve months of onset (Tr. at 179).

Sulley's treating physicians included Dr. Monique Kusler at the Cardiology Clinic at the Nebraska Medical Center (Tr. at 229) and Dr. Shurmur, Sulley's treating cardiologist (Tr. at 26 & 207). Sulley was also treated for an incisional hernia by Dr. George Pisimisis on July 3, 2007. (Tr. at 354 & 357).

On July 28, 2004, Sulley saw Dr. Kusler. Dr. Kusler diagnosed Sulley with unstable angina based upon her reported increased frequency of anginal episodes (Tr. at 237). Sulley stated she had stopped taking Plavix (blood thinner) because she was having teeth pulled (Tr. at 237), and she claimed she was taking nitroglycerin tablets almost daily. (Tr.

at 237). Dr. Kusler advised Sulley not to do much in the way of exertion "for now." (Tr. at 237).

On April 18, 2005, Ali Mir, M.D., at the Cardiology Clinic, noted that, in August 2004, Sulley returned to the Cardiac Catheterization Laboratory where she was found to have noncritical CAD and a widely patent stent in the RCA. (Tr. at 209). Sulley complained to Dr. Mir of pressure-like chest discomfort, increasing fatigue, and shortness of breath. (Tr. at 209). She reported using four or five sublingual nitroglycerin in the previous week. (Tr. at 209).

On April 18, 2005, Sulley also saw her treating physician, Dr. Shurmur, at the Cardiology Clinic. (Tr. at 207). Dr. Shurmur described her August 2004 catheterization as showing "minimal" restenosis in the RCA. (Tr. at 207). He adjusted her medications and planned to proceed with a dobutamine stress echocardiogram. (Tr. at 207).

Thereafter, the record does not reflect any medical treatment until May 31, 2006, when Sulley returned to the Cardiology Clinic. (Tr. at 275-76). At that time, Dr. Shurmur observed that Sulley continued to smoke and was not interested in stopping; did not exercise regularly; and reported severe fatigue and severe dyspnea with exertion – which responded to inhalers and sometimes to nitroglycerin. (Tr. at 275). Dr. Shurmur's assessment was that Sulley had CAD, but her symptoms appeared to be largely pulmonary in nature. (Tr. at 275). He noted that relatively recent documentation of her cardiac status suggested no significant obstructive disease. (Tr. at 275). Dr. Shurmur further opined that her recent attempts to return to work were unsuccessful due to severe fatigue and deconditioning. (Tr. at 276). He concluded that "[i]n the absence of smoking cessation and

5

significant physical training program, Mrs. Sulley does not appear to be able to hold any sort of gainful employment with any physical demands at this juncture." (Tr. at 276).

On August 8, 2006, Sulley underwent a three-vessel coronary artery bypass ("CAB") procedure (Tr. at 319-20). She was discharged to home on August 12, 2006, in stable condition. (Tr. at 319-20). On August 25, 2006, Sulley reported that she was doing well and not been experiencing any shortness of breath or cardiac chest pain. (Tr. at 316).

On October 17, 2006, Marilyn E. Hallinan, M.D., examined Sulley who reported that she had been participating in cardiac rehabilitation. (Tr. at 244-45). At that time, Sulley stated she was exercising on a bike for five minutes, a treadmill for five minutes, an arm bike for three to four minutes, and doing stretching activities. (Tr. at 245). She reported that she no longer had chest pain. (Tr. at 248). She said she had shortness of breath with exertion and felt that she was going through menopause. (Tr. at 248). Pulmonary function studies showed a mild obstructive pattern. (Tr. at 251). Dr. Hallinan diagnosed Sulley with CAD, status post three-vessel CAB, chronic obstructive pulmonary disease (COPD), tobacco abuse, back and hip pain, and a history of cervical dysplasia. (Tr. at 252). She encouraged Sulley to be physically active and to stop smoking (Tr. at 252). Dr. Hallinan did conclude that any weight lifting should be temporarily limited until Sulley's chest wall healed. (Tr. at 252).

On December 13, 2006, the Nebraska Medical Center reported that Sulley had exited early from the cardiac rehabilitation program and was being discharged for noncompliance. (Tr. at 310). Sulley had been scheduled for 24 sessions, beginning in September of 2006, and had completed none. (Tr. at 311). In her supplemental evidence that she presented to the Appeals Council, Sulley reported that she had neither the

transportation nor the money to travel to rehab. (Tr. at 451). She also reported that it was too far and too cold outside for her to walk. (Tr. at 451).

On June 25, 2007, Dr. Shurmur again saw Sulley at the Cardiology Clinic (Tr. at 357-58). He noted that Sulley appeared "to be asymptomatic from a cardiac standpoint 11 months following her surgery." (Tr. at 357).

On July 16, 2007, Sulley underwent a procedure to repair a hernia. (Tr. at 338-39). Jay Hawkins, M.D., noted that, following hernia repair surgery, Sulley denied chest pain, shortness of breath, nausea, vomiting, lightheadedness, or diaphoresis. (Tr. at 342). Sulley stated that although she was feeling fine before surgery and in her normal state of health, she continued to experience stable angina. (Tr. at 342).

On August 6, 2007, Dr. Shurmur completed a Medical Source Statement - Physical (RFC Assessment) in which he concluded that Sulley could lift and/or carry up to 25 pounds frequently and occasionally and that her walking, standing, and sitting were not affected by her impairments. (Tr. at 414-17). He reasoned that pushing/pulling should be severely limited due her recent sternotomy. (Tr. at 415). Dr. Shurmur reported that Sulley should never climb or balance but could occasionally kneel, crouch, crawl, and stoop. (Tr. at 415). Dr. Shurmur further opined that Sulley had no manipulative, communicative, or environmental limitations. (Tr. at 416-17).

### ADMINISTRATIVE HEARINGS

At the second administrative hearing, on August 4, 2006, Sulley testified that a doctor indicated that she could work three or four hours a day. (Tr. at 462). She reported using her nebulizer for fifteen minutes, three or four times a day. (Tr. at 462). She testified that she used nitroglycerin about twice a week (Tr. at 462), and her chest pain lasted for

two or three minutes at a time. (Tr. at 464). She also stated that her daily activities included watching television, cooking, picking up the house, and doing laundry when needed. (Tr. at 463). She testified that she could barely lift her grandson who weighed 40 pounds. (Tr. at 463-64). When questioned as to whether she had ceased smoking, Sulley answered, "I'm down to maybe three of four a day when I, like after a meal." (Tr. at 466).

At the third administrative hearing, on April 17, 2007, Morris Alex, M.D., a medical expert, testified that although Sulley suffered from hypertension, obesity and ischemic heart disease, she should be able to do light work. (Tr. at 476-78). Anita Howell, a vocational expert, testified that Sulley should be able to perform her past work as a cashier and as a production cutter. (Tr. at 480).

At the final hearing on August 9, 2007, Dr. Alex testified that based on the new information in the file (the results from the pulmonary function study and stress test), Sulley's diagnoses had not changed. (Tr. at 488). The doctor testified that Sulley had been urged to stop smoking and urgently needed to do so. (Tr. at 489). Dr. Morris testified that he agreed with Dr. Shurmur's analysis (Tr. at 489), except that Dr. Morris reasoned that Sulley's pushing/pulling did not need to be severely limited and could be performed occasionally. (Tr. at 491). Dr. Morris also opined that Sulley should avoid extreme temperature and humidity. (Tr. at 491). Deborah Determan, a vocational expert, testified that even considering Sulley's alleged limitations, she could perform her past work as it is performed in the national economy. (Tr. at 492). Ms. Determan also testified that this testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 492).

**THE ALJ'S FINDINGS**

In her decision dated August 13, 2007, the ALJ concluded that Sulley had not performed substantial and gainful activity since March 3, 2004 (the date of onset of her alleged disability). (Tr. at 27). The ALJ found that Sulley had the following "severe" impairments: "chronic obstructive pulmonary disease, and multi-vessel coronary artery disease manifested by myocardial infarction in March 2004 and resulting in two angioplasties and triple vessel coronary artery bypass surgery." (Tr. at 24). The ALJ then determined that Sulley's medical impairments did not meet the listings (*see* Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4.). The ALJ continued her analysis, concluding that:

> While such impairments have imposed limitations upon her ability to perform basic work-related functions, there has been no period of at least twelve consecutive months since her alleged onset date of disability during which the Claimant could not occasionally lift/carry items weighing 20 pounds; frequently lift/carry items weighing up to 10 pounds; sit, stand and walk without restriction; occasionally use her arms for pushing and pulling; occasionally kneel, crouch, crawl and stoop; and use her arms and hands to reach, handle, finger and feel without limitation. However, she can never climb or balance, and she should not be exposed to temperature extremes, humidity or to environmental irritants.

(Tr. at 27).

After considering Sulley's RFC assessments in the record, the ALJ found that Sulley could "perform her past relevant work as a cashier." (Tr. at 28). In making this determination, the ALJ listed several reasons why she found Sulley's testimony to be, insofar as it attempted to establish total disability, not credible. (Tr. at 26 (citing Sulley's "spotty work record . . .; the testimony of Dr. Alex; the functional capacity assessment submitted by Dr. Shurmur . . .; [the fact that she] has continued to smoke cigarettes against

medical advice; and, following her bypass surgery, received an early discharge from her cardiac rehabilitation program due to noncompliance.")).

As a result, the ALJ concluded that Sulley was not disabled under the Social Security Act, and therefore was not entitled to a period of disability, to the payment of disability insurance, or to the payment of supplemental security income benefits. (Tr. at 28).

**EVIDENCE SUBMITTED POST-HEARING**

Subsequent to the final hearing and the ALJ's decision, Sulley submitted additional evidence and argument to the Appeals Council through her attorney. (Tr. at 434-451). Those items included two physician confidential reports (Tr. at 446 & 447), a note from Dr. Shurmur regarding Sulley's inability to work (Tr. at 449), a letter from Sulley dated January 4, 2008 (Tr. at 451), and a medical questionnaire Dr. Shurmur completed on January 4, 2008. (Tr. at 450). In the questionnaire, Dr. Shurmur reasoned that for the period running from March 2004 to July 2007, Sulley would have required several unscheduled rest periods a day lasting at least 10-15 minutes each. Dr. Shurmur also opined that her symptoms would have caused her to be absent from work frequently in excess of three days per month. (Tr. at 450).

On May 29, 2008, the Appeals Council, after considering the newly submitted evidence, denied Suley's request for review. (Tr. at 7-10). The decision of the ALJ became final at that time.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)("As we have stated many times, we do not reweigh the evidence

presented to the ALJ."); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995)(holding that the district court does not "reweigh the evidence or try the issues de novo."). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

Sulley contends that the substantial evidence in the record does not support the ALJ's decision, based on several arguments discussed below. Upon review of the record and applicable law, this Court concludes that the substantial evidence on the record does support the ALJ's decision, and consequently, the final decision of the Commissioner is affirmed.

1. **Whether the ALJ Failed Properly To Consider the New Evidence in the Record**

Sulley argues that the ALJ's decision is not supported by substantial evidence on record in light of additional evidence not considered by the ALJ and presented only to the Appeals Council after the ALJ rendered her decision. The Appeals Council, however, considered Sulley's new evidence and found that her "contentions do not raise any new issue of law or fact." (Tr. at 8). The Council further reasoned that the new "evidence submitted does not suggest the claimant would be limited beyond that found in the decision for any continuous 12 month period during the period in issue." (Tr. at 8).

Because "it is clear that the Appeals Council has considered [the] newly submitted evidence, we do not evaluate the Appeals Council's decision to deny review. Instead, our role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). The Court has reviewed the additional evidence submitted by Sulley and has concluded that the ALJ's decision remains fully supported by the substantial evidence on the record. This new evidence, therefore, does not warrant reversal of the ALJ's decision.

Regarding the new evidence presented to the Appeals Council, Sulley suggests that Dr. Shurmur's statement, concluding that Sulley will be "unable to return to work from a cardiovascular standpoint for the forseeable future" (Tr. at 449), demonstrates that the evidence on record does not support the ALJ's decision. A doctor's statement regarding a claimant's ability to work, however, is "not a medical opinion but an opinion on the application of the statute." *Flynn v. Chater*, 107 F.3d 617, 622 (8th Cir.1997)(internal

quotations omitted).  Thus, the ALJ was correct to disregard Dr. Shurmur's conclusion in applying the statute, since deciding whether the claimant is disabled is an application of the statute – a task assigned solely to the discretion of the Commissioner.  *Id.*

Sulley further argues that Dr. Shurmur's subsequently submitted questionnaire (Tr. at 450) demonstrates that Sulley does not have the capacity to sustain full-time work without numerous unscheduled rest periods and frequent, unpredictable absences.  This new evidence, however, contradicts Dr. Shurmur's earlier RFC assessment (Tr. at 414-417) – an RFC assessment Sulley has admitted concludes that "she had the ability to work" during her alleged period of disability. (Filing No. 11 at 10-11).  Because Dr. Shurmur's newly submitted evidence contradicts his other evidence in the record, the ALJ is not required to give his new evidence "controlling weight." *Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008)("[A] treating source's medical opinion is entitled to "controlling weight" if the opinion "is not inconsistent with the other substantial evidence in [the] case record")(citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2))).  Thus as an inconsistent opinion, the newly submitted evidence does not undermine the substantial evidence on the record that supports the ALJ's decision.

This Court finds that even considering Sulley's newly submitted evidence, there is substantial evidence in the record to support the ALJ's decision and, consequently, affirms the ALJ's decision.

### 2. Whether the ALJ Failed To Develop the Record Fully

Sulley also argues that the ALJ failed to develop the record fully, because she failed to request an RFC assessment from Sulley's treating physicians, and because she failed to subpoena Dr. Shurmur to testify at the administrative hearing.  Sulley is correct that it is

the ALJ's duty to develop the record fully and fairly. *Snead v. Barnhart*, 360 F.3d 834, 836-37 (8th Cir.2004). "This duty includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue." *Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001)("It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations.").

Upon review of the record and applicable law, however, the Court finds that the ALJ did fully satisfy her duty to develop the record because the ALJ's decision is supported by substantial evidence. *See Tellez v. Barnhart*, 403 F.3d 953, 956-957 (8th Cir. 2005)(dismissing plaintiff's argument that the ALJ's failure to request an RFC assessment from a treating physician constitutes reversible error where "there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence.").

In her brief, Sulley argues that the ALJ failed her duty to develop the record because "the ALJ did not seek out an RFC assessment from treating doctors and had no such opinion for the period commencing in March of 2004 and ending in July of 2007." (Filing No. 11 at 9).   However, just a few pages later in her brief, Sulley states that Dr. Shurmur's submitted medical opinions found at Transcript pages 414-17 constitute an RFC assessment indicating "she had the ability to work." (Filing No. 11 at 10-11). Thus, Sulley's contention that the record was not fully developed because the ALJ failed to consider any RFC assessments from a treating physician is directly contradicted by Sulley's own

14

contention that Dr. Shurmur's submission at pages 414-17 of the Transcript constitute an RFC assessment.[1]  Sulley's own characterization of the record, therefore, demonstrates that the ALJ did consider an RFC assessment submitted by one of Sulley's treating physicians, and consequently, her claim that the ALJ failed to develop the record is without merit.

Sulley also contends that the ALJ committed reversible error when she failed to inform her in writing of the reasons why she denied her request to subpoena Dr. Shurmur. This Court concludes, however, that the ALJ did not abuse her discretion in declining to issue the requested subpoena.

"Because the agency's regulations provide the ALJ discretion in the issuance of a subpoena, we must decide whether the ALJ abused h[er] discretion in this case." *Passmore v. Astrue*, 533 F.3d 658, 665-666 (8th Cir. 2008)(citing 20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1))(internal citations omitted).  The regulations require a claimant requesting a subpoena to "state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proved without issuing a subpoena." *See* 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2).  In this case, Sulley did not state the important facts that Dr. Shurmur's testimony would provide, nor did she explain why these facts could not be proved without the ALJ's issuance of a subpoena.  Consequently, the ALJ's failure to issue the requested subpoena does not constitute an abuse of her administrative discretion.  *See Passmore*, 533 F.3d at 666 ("We do not think that the ALJ abused his

---

[1] The Court notes that it is clear that the ALJ took Dr. Shurmur's RFC assessment into consideration when making her final RFC determination. (*See* Tr. at 26)(noting that her conclusions are supported by "the Claimant's functional abilities expressed by Dr. Shurmur, her treating cardiologist.").

15

discretion because [the Plaintiff] failed to identify, as required by regulation, the important facts that [the doctor] was expected to prove or any explanation why these facts could not be proved without a subpoena and cross-examination.")(citing 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2)).

### 3. Whether the ALJ Erred in Not Giving Controlling Weight to Dr. Shurmur's Medical Opinions

Sulley argues that the ALJ mishandled and improperly weighed the medical evidence on record because she did not give controlling weight to Dr. Shurmur's medical opinion that Sulley was unable to work. (*See* Tr. at 449). As discussed above, Dr. Shurmur's statements regarding Sulley's capacity to work are "not . . . medical opinion[s] but . . . opinion[s] on the application of the statute." *Flynn*, 107 F.3d at 622 (internal quotations omitted). As such, the ALJ is correct to disregard Dr. Shurmur's conclusions regarding how to apply the statute because "applying the statute is a task assigned solely to the discretion of the [Commissioner]". *Id.*

Sulley further argues, however, that the ALJ's reliance on the medical opinions of Dr. Alex, Dr. Hillyer, and Dr. Hallinan do not constitute reliance on substantial evidence, because the ALJ failed fully to consider Dr. Shurmur's medical opinions that support the contrary conclusion that Sulley was not able to work during her alleged period of disability. In forming her final decision, however, the ALJ did consider Dr. Shurmur's RFC assessment (*see* Tr. at 26), and Sulley admits that "Dr. Shurmur's RFC indicated she had the ability to work." (Filing No. 11 at 10-11). While some of Dr. Shurmur's medical opinions that Sulley subsequently submitted to the Appeals Council may support her argument that she was disabled, the Court has already evaluated the newly submitted evidence and

16

concurs with the Appeals Council that the substantial evidence on record still supports the ALJ's decision.

Because the ALJ's decision was "supported by the testimony of Dr. Alex, the clinical findings contained in the reports submitted by Dr. Hillyer and Dr. Hallinan, and by the opinions regarding the Claimant's functional abilities expressed by Dr. Shurmur," the Court finds that substantial evidence supports the ALJ's decision, and the ALJ, therefore, did not mishandle or improperly weigh the evidence. As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney,* 228 F.3d at 863.

### 4. Whether the ALJ's RFC Determination is Supported by Substantial Evidence in the Record

Sulley essentially re-states her previous arguments that the ALJ improperly weighed the opinions of her treating physicians, and she asserts that the ALJ's RFC determination is not supported by substantial evidence in the record. As the Court has already evaluated the ALJ's weighing of the medical evidence in her RFC determination, and Sulley presents no new evidence or argument to discredit the ALJ's RFC determination, the Court finds, for the reasons stated above, that the ALJ did not abuse her discretion in making the RFC determination regarding the Sulley's capacity to work.

### 5. Whether the ALJ Submitted an Inaccurate Hypothetical to the ALJ

Finally, Sulley contends that the ALJ erred because she submitted an inaccurate hypothetical to the Vocational Expert ("VE"). To support her argument that the hypothetical was inaccurate, Sulley merely "incorporates all criticisms of the ALJ's RFC finding and of

the ALJ's weighting [sic] of the medical evidence and restates them as a criticism of the ALJ's hypothetical." (Filing No. 11 at 16). The Court, however, has already reviewed Sulley's criticisms of the ALJ's RFC finding and the ALJ's weighing of the medical evidence, and the Court has concluded that the substantial evidence in the record supports the ALJ's RFC finding and weighing of the medical evidence. As a result, the Court concludes that Sulley's blanket assertion that the hypothetical was inaccurate is without merit.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's determination that the Plaintiff, Sherry L. Sulley, is not disabled is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1. The decision of the Commissioner is affirmed;

2. The Plaintiff's appeal is denied; and

3. Judgment in favor of the Defendant will be entered in a separate document.


DATED this 16th day of March, 2009.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge